Howard **LUGAR**

v.

**TEXACO, INC.,** Appellant.

No. 84-3197.

United States Court of Appeals, Third Circuit.

Argued Oct. 30, 1984.

Decided Feb. 14, 1985.

**54**

George E. Mittelholzer (argued), Cherry Hill, N.J., Melvin L. Moser, Jr., Buchanan & Ingersoll, P.C., Pittsburgh, Pa., for appellant.

Daniel J. Beggy (argued), Mansmann, Beggy & Campbell, Pittsburgh, Pa., for appellee.

Before GARTH and SLOVITER, Circuit Judges, and LORD, District Judge.*

## OPINION OF THE COURT

SLOVITER, Circuit Judge.

### I.

This case addresses, for the first time, whether an oil company which supplies fuel to its franchised dealers is obliged, before failing to renew the franchise, to offer to assign to the dealer an option to purchase the premises under Title I of the Petroleum Marketing Practices Act (PMPA), 15 U.S.C. §§ 2801–2806 (1982).

Howard Lugar, the plaintiff below, operated a service station in Monroeville, Pennsylvania, pursuant to an agreement with Texaco, Inc. The property on which Lugar's Texaco station was located had been leased to Texaco in 1966 by Anna Wukich, the owner. The lease provided for an initial term which expired on May 31, 1981, but Texaco could renew the lease for three additional five-year terms. The lease also gave Texaco an option to purchase the property for $125,000 at any time after the tenth year of the lease. Texaco in turn subleased the property to Lugar. The sublease also expired on May 31, 1981.

Although the district court made no findings on this issue, the parties agree that Texaco decided to cease supplying its branded products directly to service stations in western Pennsylvania and to market them instead through distributors. To implement this decision, Texaco sought to divest itself of its direct obligations to retailers, including those to Lugar. Texaco advised Lugar in January 1981, confirmed by letter on February 20, 1981, that it would not renew the lease and sales agreement between them. On February 8, 1981, Lugar's attorney sent a letter to Texaco requesting that the purchase option in the Wukich to Texaco lease be assigned to Lugar. Texaco never responded to this request.

On May 31, 1981, both the lease and the sublease expired. Lugar took with him all his tools and equipment and Texaco, pursuant to its rights under the lease, razed the building and relinquished all interest in the property. Thereafter, Lugar filed the present action alleging that Texaco had violated the PMPA.

### II.

Congress enacted the PMPA in June 1978 after considerable debate and extensive inquiry into alleged unfair treatment of fuel dealers by their suppliers. Title I of the Act was designed to strengthen the position of the franchisees in bargaining with their franchisors. S.Rep. No. 731, 95th Cong., 2d Sess. 1, 18–19 *reprinted in* 1978 U.S.Code Cong. & Ad.News 873, 876–77 (hereafter Senate Report). Congress focused on two areas of particular concern to service station operators: nonrenewal of the franchise or its arbitrary termination. The Act provides that a franchisor may terminate or fail to renew a franchise only for the reasons provided in the statute and by giving the requisite notice, § 102(a), 15 U.S.C. § 2802(a) (1982). The permissible grounds are set forth in two sections of the Act, sections 102(b)(2) and 102(b)(3), 15 U.S.C. §§ 2802(b)(2), 2802(b)(3).

---

* Hon. Joseph S. Lord, III, Chief Judge Emeritus, United States District Court for the Eastern District of Pennsylvania, sitting by designation.

Five grounds are listed in section 102(b)(2) of the PMPA as valid bases for either termination or nonrenewal. They are: (A) the failure of the franchisee to comply with reasonable and material provisions of the franchise, 15 U.S.C. § 2802(b)(2)(A); (B) the failure of the franchisee to make good faith efforts to carry out the provisions of the franchise, 15 U.S.C. § 2802(b)(2)(B); (C) the ocurrence of an event which is relevant to the franchise relationship and which makes termination or nonrenewal reasonable, 15 U.S.C. § 2802(b)(2)(C); (D) the termination or nonrenewal by written agreement, 15 U.S.C. § 2802(b)(2)(D); and (E) a determination by the franchisor made "in good faith and in the normal course of business" to withdraw from the relevant geographic marketing area, 15 U.S.C. § 2802(b)(2)(E).

The succeeding section 102(b)(3) sets forth additional grounds which may form the basis for nonrenewal, but not for termination. These include (A) failure of the parties to agree to changes in the franchise arrangement "made by the franchisor in good faith and in the normal course of business," 15 U.S.C. § 2802(b)(3)(A); (B) receipt by the franchisor of numerous bona fide complaints from customers regarding the franchisee's operations, 15 U.S.C. § 2802(b)(3)(B); (C) the franchisee's failure to operate the premises in a clean, safe, and healthful manner; and, finally, (D) the franchisor's determination "in good faith and in the normal course of business" to convert the premises to another use, to alter, add to or replace them, or to sell the premises, or its determination that renewal of the franchise relationship is likely to be uneconomical to the franchisor despite reasonable additions to the agreement, 15 U.S.C. § 2802(b)(3)(D).

A franchisor who relies on the grounds set forth in § 2802(b)(2)(E) or § 2802(b)(3)(D) for nonrenewal must first, if it leases the marketing premises, have made "a bona fide offer to sell, transfer, or assign to the franchisee such franchisor's interests in such premises," or have offered the franchisee a right of first refusal. 15 U.S.C. §§ 2802(b)(2)(E)(iii)(I), 2802(b)(3)(D)(iii). *See Roberts v. Amoco Oil Co.*, 740 F.2d 602, 605–06 (8th Cir.1984).

In his complaint Lugar alleged that Texaco was required to assign the purchase option to him pursuant to the provision in 15 U.S.C. § 2802(b)(3)(D)(iii). However, this section imposes obligations on a franchisor only if it seeks to justify nonrenewal of the franchise arrangement on the basis of its determination as set forth in that section. As the district court recognized, Texaco made no such determination. Therefore, the court held 15 U.S.C. § 2802(b)(3)(D) inapplicable, and Lugar has not appealed this ruling.

Texaco moved for summary judgment, claiming that it had a statutory right not to renew Lugar's franchise because 15 U.S.C. § 2802(b)(2)(C) permits the franchisor not to renew a franchise if an event occurs that makes nonrenewal "reasonable", and 15 U.S.C. § 2802(c)(4) gives as an example of such an event "the expiration of an underlying lease." Since the Wukich lease to Texaco expired on May 31, 1981, it argued it was entitled to judgment as a matter of law.

The district court entered summary judgment *sua sponte* against Texaco and for Lugar. The court held that Texaco could not claim the protection of § 2802(b)(2)(C) because its failure to assign the purchase option to Lugar was unreasonable.[1] Thereafter, the issue of damages was submitted to a jury which awarded damages of $47,000.

Texaco now challenges both the holding of liability and the facts and theories on the basis of which damages were awarded. Because we reverse on the issue of liability, we have no occasion to consider the damages issues.

**1.** The court also entered judgment for Lugar on Texaco's counterclaim seeking attorneys' fees for what it claimed was Lugar's "frivolous" suit. 15 U.S.C. § 2805(d)(3). Texaco has not appealed that decision.

**56**

### III.

Under the PMPA, it is the franchisor's "burden of going forward with evidence to establish as an affirmative defense that such termination or nonrenewal was permitted...." § 105(c), 15 U.S.C. § 2805(c) (1982). The text of the provision upon which Texaco relies in order to justify its failure to renew Lugar's franchise states that if the proper notice has been given, "the following are grounds for ... nonrenewal of a franchise relationship:"

> (C) The occurrence of an event which is relevant to the franchise relationship and as a result of which ... nonrenewal of the franchise relationship is reasonable, if such event occurs during the period the franchise is in effect....

§ 102(b)(2)(C), 15 U.S.C. § 2802(b)(2)(C).

Lugar makes no complaint about the manner or timing of his notification; rather, he insists that no event occurred that made nonrenewal "reasonable". Congress provided an illustrative but non-exclusive list of such "events" in 15 U.S.C. § 2802(c). The illustration on which Texaco relies is:

> (4) loss of the franchisor's right to grant possession of the leased marketing premises through expiration of an underlying lease, [provided the requisite notice is given].

Looking only at the language of the statute, it is plausible to argue that the franchisor's voluntary relinquishment of a lease does not constitute a permissible "event". However, the legislative history shows otherwise. According to the Senate Report,

> Expiration of the underlying lease could occur under a variety of circumstances *including*, for example, *a decision by the franchisor not to exercise an option to renew the underlying lease.* However, it is not intended that termination or non-renewal should be permitted based upon the expiration of a lease which does not evidence the existence of an arms length relationship between the parties and as a result of the expiration of which no substantive change in control of the premises results.

Senate Report at 38, 1978 U.S.Code Cong. & Ad.News at 896 (emphasis added).

Consequently, every court that has had occasion to address this issue has held that the presence of an option to renew the underlying lease does not change the result. *See, e.g., Bernardini v. Exxon Corp.,* 1981–1 Trade Cas. (CCH) ¶ 63,921 at 75,772–73 (E.D.Pa.1981); *Gaspar v. Chevron Oil Co.,* 490 F.Supp. 971, 974 (D.N.J. 1980); *Sachi v. Mobil Oil Corp.,* 1980–1 Trade Cas. (CCH) ¶ 63,044 at 77,194–95 (E.D.N.Y.1979). *See generally* Finch, *Judicial Interpretation of the Petroleum Marketing Practices Act: Strict Construction of Remedial Legislation,* 37 Bus.Law. 141, 155–160 (1981). Moreover, the First Circuit has held that even where the franchisor took affirmative action not to extend a lease that would otherwise have renewed automatically, there was no violation because the nonrenewal was justified by an enumerated "event", the "expiration" of the underlying lease. *Veracka v. Shell Oil Co.,* 655 F.2d 445, 448 (1st Cir.1981).

The district court treated this line of precedent as inapplicable because Texaco did not assign Lugar the option to purchase the property when requested. The court held, "Since Texaco did not assign this right, Texaco cannot claim the protection of section 2802(b)(2)(C) because it retained the right until May 31, 1981 to grant Mr. Lugar a guarantee of possession if he exercised the option even though the lease would expire." However, as the cases cited above have held, the franchisor has no obligation under 15 U.S.C. § 2802(c)(4) to take affirmative steps to put itself in the position where it can grant possession to the franchisee. It follows that if the franchisor has no obligation to exercise its option to renew the lease, it has no obligation under the same section to exercise or assign the option to purchase the premises.

Although there is no other case presenting precisely this issue, the available precedent is that obligations imposed under other sections of the Act cannot be imposed on a franchisor who relies on 15 U.S.C.

§ 2802(c)(4). Thus, in *Sachi v. Mobil Oil Corp.*, 1980–1 Trade Cas. at 77,192, the court rejected the dealer's argument that the franchisor had an affirmative obligation to negotiate about the franchise agreement before permitting the option to lapse. The court held that § 102(c)(4) of the Act "must be read independently of the terms [such as the negotiation requirements of § 102(b)(2)(D)(i)(IV) ] contained in other sections of the Act." *Id.* at 77,194.

Similarly, in *Bernardini v. Exxon Corp.*, 1981–1 Trade Cas. at 75,770, the court declined plaintiff's invitation to read 15 U.S.C. § 2802(c)(4) in conjunction with other provisions of the PMPA. Specifically, it held that the franchisor relying on that section had no obligation to make a bona fide offer to sell, transfer or assign the renewal option to the franchisee as it must under 15 U.S.C. § 2802(b)(3)(D)(iii)(I) if the franchisor relies on its determination to convert, replace or sell the premises or not to renew the franchise as uneconomical. *See also Brungardt v. Amoco Oil Co.*, 530 F.Supp. 744, 746–47 (D.Kan.1982). As the court noted in *Veracka v. Shell Oil Co.*, 655 F.2d at 448, the Act's reference to expiration of the lease is without reference to the expiration's cause.

The obligation that the district court imposed on Texaco, the duty to negotiate concerning the franchisor's interest in the land, could have been, but was not, imposed by Congress on a franchisor who relies on the lease expiration under 15 U.S.C. § 2802(c)(4). Significantly, in two specific circumstances, those covered under 15 U.S.C. §§ 2802(b)(2)(E) and 2802(b)(3)(D), Congress imposed such an obligation on the franchisor. Texaco's decision may fit within 15 U.S.C. § 2802(b)(2)(E) in that it might have been found to be "a determination made by the franchisor in good faith and in the normal course of business to withdraw from the marketing of motor fuel through retail outlets in the relevant geographic market area in which the marketing premises are located." Such a determination constitutes a basis for nonrenewal only if the franchisor offered to sell, transfer, or assign its interest in the premises to the franchisee. Even if this issue were squarely presented,[2] when the franchisor has two statutory bases for its nonrenewal, one that is conditional and one that is not, its reliance on the nonconditional basis would not be precluded. Otherwise, the courts would be adding a qualification to the statutory language which Congress did not impose.

Because the district court believed that Texaco did not fit within one of the 12 statutory illustrations of an event that makes nonrenewal "reasonable", it proceeded to determine the "reasonableness" of Texaco's action. It is apparent from the legislative history that this is the proper standard to be applied to *non-enumerated* grounds for nonrenewal or termination. The Senate Report states:

One of the grounds specified in paragraph 2 of section 102(b) as a ground for termination or nonrenewal is the occurrence of an event which is relevant to the franchise relationship as a result [of which] termination or nonrenewal of the franchise is reasonable. Subsection (c) of section 102 sets forth an illustrative list of such events. The enumerated list is not exclusive. Other events satisfying the statutory standards set forth in section 102(b)(2)(C), but not enumerated in the list set forth in subsection (c) of section 102, may nevertheless serve as a ground for termination or nonrenewal under section 102(b)(2)(C).

However, the enumerated list is intended to provide a measure of Congressional intent with respect to the meaning of this statutory standard. For that reason the term "includes events such as" is

---

**2.** Lugar did not cite or rely on this section in the district court in opposition to Texaco's motion for summary judgment, nor does it cite or rely on it here. Our jurisprudence ordinarily limits our consideration to issues presented by the parties. *See Battle v. Pennsylvania*, 629 F.2d 269, 271 n. 1 (3d Cir.1980), *cert. denied,* 452 U.S. 968, 101 S.Ct. 3123, 69 L.Ed.2d 981 (1981). Because of the failure to present the issue below, the district court did not make any findings as to the applicability of 15 U.S.C. § 2802(b)(2)(E).

utilized. Thus, a judicial determination may be made that an event, other than one enumerated in this list, or an event similar but not identical to one enumerated in the list, constitutes an event which is relevant to the franchise relationship as a result of which termination or non-renewal is reasonable. However, events which are not enumerated in subsection (c) must be carefully scrutinized by the courts prior to a determination that the statutory standard set forth in section 102(b)(2)(C) has been satisfied.

Senate Report at 37–38, 1978 U.S.Code Cong. & Ad.News at 896.

Accordingly, courts have examined the reasonableness of a franchisor's action when based on grounds not specified in the enumerated list. *Compare Hifai v. Shell Oil Co.,* 704 F.2d 1425, 1430 (9th Cir.1983) (franchisor acted reasonably in recovering possession of premises so that it could avoid forfeiture of the improvements) with *Brach v. Amoco Oil Co.,* 677 F.2d 1213, 1219–23 (7th Cir.1982) (nonrenewal because franchisee failed to purchase the marketing premises must be examined for materiality of a real estate contract to franchise relationship, reasonableness of terms of the real estate contract, and whether the default was beyond the reasonable control of the franchisee). *Cf. Kostantas v. Exxon Co.,* 663 F.2d 605 (5th Cir.1981) (franchisee's death justified termination), *cert. denied,* 456 U.S. 1009, 102 S.Ct. 2302, 73 L.Ed.2d 1305 (1982). However, because we have found that Texaco's nonrenewal fit within 15 U.S.C. § 2802(c)(4), the court could not evaluate the reasonableness of Texaco's action under 15 U.S.C. § 2802(b)(2)(C).

There is no other statutory basis to apply a reasonableness test here.[3] It is of some significance that even where Congress did subject certain franchisor's decisions to judicial scrutiny, it eschewed a broad "reasonable business judgments" test, saying:

At this point it is appropriate to note that considerable debate has focused upon recognition of so-called "reasonable business judgments" of the franchisor as grounds for termination or non-renewal. *This standard has not been adopted by the committee.* Instead, a two-fold test has been utilized to judge *certain specified determinations* including that of market withdrawal.

One test is whether the determination was made "in good faith". This good faith test is meant to preclude sham determinations from being used as an artifice for termination or non-renewal. The second test is whether the determination was made "in the normal course of business". Under this test, the determination must have been the result of the franchisor's normal decisionmaking process. These tests provide adequate protection of franchisees from arbitrary or discriminatory termination or non-renewal, yet avoid judicial scrutiny of the business judgment itself. Thus, it is not necessary for the courts to determine whether a particular marketing strategy, such as a market withdrawal, or the conversion of leased marketing premises to a use other than the sale or distribution of motor fuel, is a wise business decision.

Senate Report at 37, 1978 U.S.Code Cong. & Ad.News at 895–96 (emphasis added).

We recognize that there are strong policy reasons to support Lugar's argument

---

**3.** The provision at issue here is unlike those considered by this court recently in *Sun Refining & Marketing Co. v. Rago,* 741 F.2d 670 (3d Cir.1984). There, the franchisor sought to justify termination on the two grounds enumerated as justifications for termination or nonrenewal in 15 U.S.C. § 2802(c)(8) and (9): the franchisee's failure to pay money due in a timely manner and its failure to operate the station for ten consecutive days. Because the statute excuses a franchisee's failures when they are due to "a cause beyond the reasonable control of the franchisee," 15 U.S.C. § 2801(13)(B), we were obliged to analyze whether the franchisee's failure to open the station for ten days was unwarranted before we could find that the termination was justified under 15 U.S.C. § 2802(c)(9). *Rago,* 741 F.2d at 674. Significantly, we held that termination was justified so long as the franchisor had met the terms of one condition for termination, even if it did not qualify under the other condition.

that a franchisor should be obliged to offer to sell, assign or transfer its option to purchase the premises. Unlike a lease, which would involve the franchisor in a continuing obligation to its lessor, the purchase of the premises by the dealer would probably terminate the franchisor's responsibilities.[4] However, in enacting the PMPA, Congress undertook the delicate task of balancing the competing interests of fuel franchisors and their dealers. In light of the detailed obligations it imposed on franchisors under certain circumstances, such as the duty to offer to assign a purchase option, we believe that we cannot impose that obligation where Congress did not. Consequently, the district court erred in holding that Texaco's failure to negotiate the assignment of the purchase option took it outside the terms of 15 U.S.C. § 2802(c)(4).

### IV.

For the foregoing reasons, we find that the expiration of Texaco's lease justified its failure to renew Lugar's franchise as provided in 15 U.S.C. §§ 2802(b)(2)(C) and 2802(c)(4), and that Texaco's option to purchase the premises does not change this result. Therefore, we will reverse the district court's entry of summary judgment for Lugar and remand with direction to enter summary judgment for Texaco.

---

**4.** Texaco argues that it is uncertain whether they could assign the purchase option apart from the lease. *But see Meyers v. Epstein,* 37 Pa. D & C 2d 549, 554–58 (C.P.Leh. County 1965).

Texaco also expressed concern that a default by Lugar would open it to liability, an issue on which we express no opinion.